UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NATANAEL RIVERA,

        Plaintiff,

  v.                                                  Case No. 13-C-124

ROBIN LINDMEIER,

        Defendant.

---

**DECISION AND ORDER**

---

       Plaintiff, an inmate at Green Bay Correctional Institution at all times relevant to this lawsuit, brought this action alleging that Defendant Robin Lindmeier violated the Eighth Amendment when she placed Plaintiff in restraints and shackles for twelve hours on May 23, 2011. The Defendant has moved for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies. She also argues that even if Rivera did exhaust his remedies, he cannot make out an Eighth Amendment violation. For the reasons given below, the motion will be granted and the case will be dismissed.

**I. Background**

       Most of the operative facts are uncontested, as Rivera did not file a response to the Defendant's proposed findings of fact or file any admissible evidence to the contrary. (He filed an affidavit and some other evidentiary materials, but these do not pertain to the facts surrounding his placement in restraints.) On the evening of May 23, 2011, Rivera began banging on the door of his cell, apparently upset that he did not have certain items of his property that he wanted. He

continued banging despite being told to stop. Several hours later Rivera was still pounding on his cell and refused to comply with an order to stop.

When Lt. Lindmeier arrived at Rivera's cell, she noted that the sound of the banging was echoing throughout the entire wing, which was disruptive to other inmates and encouraged them to act out as well. Lindmeier told Rivera that he would be placed in Control Status due to his continued failure to adhere to guards' orders to stop banging. Soon after, Rivera began banging again and yelled at the guards to "suit up motherf—kers," a reference to the fact that guards would require protective gear to perform a cell extraction on him. He continued yelling and cursing at the guards.

The warden gave permission for the guards to use incapacitating agents. Lindmeier first cleared this with a prison nurse, who indicated that Rivera had no medical issues that would prevent the use of gas. When Lindmeier returned to Rivera's cell, he had pressed his mattress up against the cell door to prevent the gas from being shot into his cell. Lindmeier repeatedly asked Rivera to comply and to place his hands outside to be handcuffed, but he failed to respond. Two more orders to comply were ignored. At this point Lindmeier ordered the use of tear gas. Despite Rivera's efforts to block his cell door, guards were able to shoot a jet of gas into the food trap.

The guards soon noticed that Rivera had a foreign object inside his mouth, which Rivera says was part of a milk carton and which Lindmeier describes as a piece of soap. Lindmeier (not knowing what it was at the time) believed the object could be used to harm Rivera or staff during an extraction. Rivera refused to spit the object out, and ultimately Lindmeier ordered another shot of tear gas after Rivera continued to hold the object in his mouth. This finally resulted in Rivera spitting the object out and placing his hands in the trap door to receive handcuffs. A guard then

2

placed leg restraints on Rivera, after which Rivera refused to get up off the floor. Officers then had to lift Rivera off the floor and transport him using a restraint chair.

At some point Rivera's clothes were removed. Lindmeier states that this was necessary because he would be given a shower immediately to wash the tear gas off, and also because his clothes had been exposed to the gas. While in the restraint chair, Rivera was given a shower and was then moved to a different cell. At some point, as shown in the DVD video of the incident, a towel was placed over his mid-section. (ECF Nos. 36, 41.) Rivera continued to resist being moved, however, telling the guards that "you're gonna have to gas me again." (DPFOF ¶ 57.)

Eventually the guards lifted Rivera onto what's called a restraint bed, a concrete structure with a thin mattress and sidebars that restraints can be attached to. RIPP restraints (RIPP is a brand name) are straps or belts that preclude movement when fastened, and Rivera was strapped around his chest, thighs, wrists and ankles. He also continued to have shackles on his ankles, which according to Lindmeier was a safety procedure adopted after inmates had managed to slip out of RIPP restraints in the past. Once Rivera was restrained, a nurse checked to see that the straps were not too tight, and a psychologist assessed Rivera. Soon after Rivera was secured in restraints, Lindmeier left and went home. (Her shift ended at 10:00 p.m.) Rivera was restrained a total of 11 hours and 5 minutes.

**II. Analysis**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party shows it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Facts and reasonable inferences are construed against the moving party. *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 673 (7th Cir. 2012).

3

Case 2:13-cv-00124-WCG   Filed 12/20/13   Page 3 of 10   Document 54

**A. Exhaustion of Remedies**

The exhaustion requirement is mandated by statute. 42 U.S.C. § 1997e(a). Inmates in Wisconsin must use the Inmate Complaint Review System set forth in Chapter 310 of the Wisconsin Administrative Code before they may file a federal civil rights claim. Wis. Admin. Code DOC § 310. This entails the filing of an offender complaint within fourteen days of the incident. It is undisputed that Rivera did not file such a complaint.

Plaintiff argues no such complaint was necessary—or even *allowed*—because a different section of the administrative code states that inmates cannot use the ICRS to raise issues relating to a conduct report. Wis. Admin. Code DOC § 310.08(2)(a) ("An inmate may not use the ICRS to raise the following issues: Any issue related to a conduct report, unless the inmate has exhausted the disciplinary process in accordance with ch. DOC 303."). Rivera was issued a conduct report for his behavior on May 23, 2011—the very behavior that precipitated the Defendant's use of shackles and restraints. Thus, Rivera believes the administrative code prevented him from filing a grievance because it "related to" behavior that gave rise to a conduct report.

That is not what § 310.08(2)(a) means. Rivera is not grieving his conduct report in this action. He does not claim, for example, that he was innocent of the charges, or that the guards trumped up evidence. Nor does he dispute that he told the guards to "suit up" and refused all of their demands that he comply with their instructions. Instead, he is grieving the response of the staff to his behavior that happened also to have given rise to a conduct report. His complaint alleges that he was in pain for hours as a result of what Defendant Lindmeier ordered. That is the substance of his federal complaint. That is not something that would have been germane to the question of his guilt or innocence of the underlying behavior, nor does it relate to the conduct report.

4

On the whole, what the regulations mean is that inmates should not use the ICRS grievance process to contest the merits of their disciplinary actions. That is what the disciplinary review hearings are for. In fact, Rivera has filed records indicating that some of his other complaints have been rejected for this very reason. On one instance he filed a complaint complaining that he had been given a conduct report on August 27, 2009. That complaint was rejected under § 310.08(2)(a) because that section prohibits complaints about conduct reports that have not been adjudicated through the disciplinary process. (ECF No. 46-5 at 8.) By contrast, here the grievance would not have been about the conduct report itself but about the correctional officers' response to his *behavior*. The conduct report had not even been written yet when his 11 hours in restraints ended. (*Id.* at 14-16.)

In short, nothing in the code says that an inmate cannot file an ICRS complaint about what correctional officers do in response to an inmate's conduct. Presumably it is quite common that conduct reports will be issued in conjunction with the imposition of punishments, and such punishments are often subject to Eighth Amendment claims brought under Section 1983. The mere fact that a conduct report was issued in a given case does not mean the inmate cannot file a grievance alleging that the punishment he received was cruel and unusual. It merely means that if he wants to challenge the validity of the conduct report, he must do so through the disciplinary process rather than ICRS.

In another recent case Judge Adelman quoted a complaint examiner's rejection of an inmate's complaint under § 310.08(2)(a):

> The complainant states a conduct report has been written, and is complaining of matters involved with the alleged incident. The complainant is challenging the factual basis of the conduct report or describing mitigating factors to explain the

5

> complainant's actions and behavior. Those matters are considered during summary disposition or by a hearing officer/committee acting as an independent fact-finding body, and its judgment must be accepted. Once a conduct report is issued, the disciplinary process is initiated, and complaints of this nature are outside the scope of the inmate complaint review system as noted under DOC 310.08(2)(a), Wis. Admin. Code.

*Walker v. Hamblin,* 2013 WL 1080440, *7 (E.D. Wis. March 14, 2013).

That paragraph ably explains that it is only matters about the inmate's behavior that are exclusively the purview of the disciplinary process—not issues relating to the constitutionality of the punishment subsequently imposed. This is made especially clear when read in conjunction with Wis. Admin. Code § DOC 310.08(3), which says that, after the conduct report has been resolved through the disciplinary process, prisoners may file a grievance "to challenge only the procedure used in the ... disciplinary process." Thus, inmates challenging conduct reports can only file grievances relating to the procedure of the disciplinary process—*not* the constitutionality of the punishment imposed. Plaintiff's reading of the regulations would mean that he would have access to *no* grievance procedure for his punishment merely because a conduct report had been issued. That is not what the regulations mandate. Instead, although matters relating to his own behavior and the validity of the conduct report were not subject to the ICRS, the complaint he now makes could have been raised through an ICRS grievance. Plaintiff never attempted to do so, and as such his claim is not properly exhausted.

At the same time, it is also true that the regulation is broadly worded: the inmate may not raise "any issue related to a conduct report." Wis. Admin. Code DOC § 310.08(2)(a). The conduct report at issue here mentions the fact that Rivera was placed in restraints. Accordingly, it is conceivable that his present complaint is an issue "related to" that report. *See, e.g., Vasquez v.*

6

*Hilbert,* 2008 WL 2224394 (W.D. Wis. 2008) ("In this case . . . the officer who issued the conduct report made it related by including the information in the conduct report."); *Shaw v. Jahnke*, 607 F. Supp.2d 1005, 1009 (W.D. Wis. 2009) (noting that "ambiguity in the regulations is a problem because prisoners may not have sufficient guidance on the appropriate course of action"). I therefore address the merits of his claim as well.

**B. There is no Eighth Amendment Violation**

Even if Rivera had properly exhausted his administrative remedies, he has not shown any Eighth Amendment violation. The substance of his claim is that he was placed in shackles and RIPP restraints for roughly 11 hours. He alleges that was very painful.

An Eighth Amendment claim has two components—objective and subjective. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Henderson v. Sheahan,* 196 F.3d 839, 845 (7th Cir.1999) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). This means that "extreme deprivations are required to make out a conditions-of-confinement claim.'" *Id.* (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)).

The subjective component requires a plaintiff to show that the Defendant acted with a purposeful state of mind or, more commonly, a mental state called deliberate indifference. This means a plaintiff must show either that the defendant intended to cause harm to the plaintiff or that he had sufficient knowledge to know that harm could easily arise out of the conditions of confinement. *Delaney v. DeTella,* 256 F.3d 679, 683 (7th Cir. 2001).

Here, Rivera fails on both components. First, eleven hours in restraints does not constitute a situation so onerous that the Eighth Amendment is implicated. Given Rivera's actions that gave rise to the restraints, it was clear that some kind of restraint was required to secure his compliance

7

with reasonable demands and to get him to calm down. Courts are not in the business of micromanaging prison staff on such matters, particularly when they take care to involve a nurse and a psychologist in the process. *Cunningham v. Eyman,* 17 Fed. Appx. 449, 454 (7th Cir. 2001) ("Cunningham spent 16 hours in shackles and four to five hours in soiled clothing. Though certainly unpleasant, these hardships were temporary and as this court's case law makes clear, they were not of sufficient severity to implicate the Eighth Amendment.")

Rivera's allegation that he was in excruciating pain is belied by the approximately one-hour video of the half-dozen correctional officers extracting him from his cell (after repeated warnings that if he did not cease his disruptive behavior, they would inject chemical incapacitating agents into his cell), cleaning him off in the shower, and placing him in control status. (Decl. of Robin Lindmeirer, ECF 36, Ex. 1000 at ECF 41.) Although the video does not continue throughout the night, it is clear from the manner in which the velcro-like RIPP restraints were fastened around his arms and legs, the precautions taken to insure he was not in pain, and Rivera's own actions that he was not restrained in such a way as to cause excruciating pain. Despite Rivera's explicit threats to sue them, it is apparent from the video that the correctional officers were taking steps intended to avoid a lawsuit. Nurse Treml was present to monitor Rivera's vital signs and to check the restraint placement to ensure the restraints did not affect his circulation. Psychological Services Unit (PSU) Dr. Martha Breen also reported to the cell to assess Rivera. He was checked every 15 minutes while in restraints, and reported to be either awake, yelling, screaming, singing or quiet. (*Id.* at ¶ 40-43.)

As for the subjective component of the analysis, Rivera cannot show that Lindmeier had anything to do with keeping him in restraints for eleven hours. She left at the end of her shift shortly after Rivera was placed in restraint and had no further involvement with him. Whatever

8

occurred after she left is outside her responsibility, and Rivera has made no effort to identify any other defendants.

In sum, an overnight confinement in shackles and restraints appears to be a reasonable response to the disruptive behavior Rivera engaged in, particularly given that he was taunting the guards and essentially demanding that he be extracted and placed in restraints. Having brought about these conditions himself, he cannot seriously expect the courts to come to his rescue when prison staff ties him to a restraint bed for a single evening. The Eighth Amendment is reserved only for those conditions of confinement that offend modern standards of decency, and Rivera's time in restraints, given his behavior, does not rise to that level.

**C. Other Motions**

Plaintiff Rivera has a history of filing lots of motions, and this case is no different. Following the Defendant's motion for summary judgment, he has filed no fewer than six motions. Some of these seek information, such as a "motion for docket texts," whose purpose is unclear. In others, he alleges he lacks sufficient legal materials and that he is being "harassed," but his own spate of filings demonstrates that he has ample ability to address the summary judgment motion and inform the court as to the nature of his allegations. He also seeks sanctions on the Defendant for what he views as a frivolous exhaustion defense. This was addressed above: the exhaustion defense is far from frivolous.

Plaintiff has also filed two motions for appointment of counsel. In another recent case, I appointed counsel for Rivera, but Rivera was unable to get along with the two attorneys who represented him. He has demonstrated there, and here, that he is intelligent enough to litigate his cases without the assistance of counsel, especially in light of the fact that a video was taken of

9

almost the entire episode giving rise to his claim. A hearing in his other case revealed that he is articulate and in firm command of the facts pertinent to his case. That is all that is required, particularly in a run-of-the-mill Eighth Amendment case like this one. *Pruitt v. Mote,* 503 F.3d 647 (7th Cir. 2007) (en banc).

### III. Conclusion

I conclude that Rivera has not exhausted his administrative remedies. Even if no such remedy was available to him, I conclude that he has failed to show any facts that would give rise to an Eighth Amendment violation. For these reasons, the Defendant's motion for summary judgment is **GRANTED** and the case is dismissed. Plaintiff's other motions are **DENIED**.

**SO ORDERED** this ___19th___ day of December, 2013.

    s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court